UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ALEXANDER LORA,                                    :

                 Petitioner,                 :              14 Civ. 2140 (AJP)

          -against-                          :              **OPINION & ORDER**

CHRISTOPHER SHANAHAN, et al.,                      :

              Respondents.                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**ANDREW J. PECK, United States Magistrate Judge:**

          Petitioner Alexander Lora seeks a writ of habeas corpus from his November 22, 2013 detention by the United States Department of Homeland Security ("DHS"), Bureau of Immigration and Customs Enforcement ("ICE").  (See Dkt. No. 2: Pet. ¶¶ 2-5.)  Lora is being detained pursuant to Section 236(c) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1226(c), which requires mandatory detention of certain criminal aliens for the duration of their removal proceedings.  8 U.S.C. § 1226(c)(1).  Lora argues that his detention is not authorized by § 1226(c) and seeks an order directing the government to provide him with an individualized bond hearing.  (See Pet. ¶¶ 6-11, Wherefore ¶ 3.)  This case requires the Court to interpret the meaning of the phrase "when the alien is released," an issue that has split the courts.  The parties have consented to my decision of this case pursuant to 28 U.S.C. § 636(c).  (Dkt. No. 9: 4/10/14 Consent to Magistrate Judge Jurisdiction.)

          For the reasons set forth below, Lora's petition is GRANTED and the government is directed to provide Lora with an individualized bond hearing by May 15, 2014 (when he already is scheduled for a conference before an Immigration Judge).

## FACTS

Lora came to the United States from the Dominican Republic in May 1990 at the age of seven, and has been a lawful permanent resident since that time.  (Dkt. No. 2: Pet. ¶¶ 1-2, 24-25; Pet. Ex. A: Peleg 3/26/14 Aff. ¶ 2; Pet. Ex. B: Lora Aff. ¶¶ 2-3.)  Lora grew up in New York City and has worked steadily as an adult.  (Pet. ¶¶ 25-26, 36; Lora Aff. ¶¶ 11, 15.)  Lora has a large network of family in the New York area, including his fiancé, chronically-ill mother and two-year-old son.  (Pet. ¶¶ 27-33; Lora Aff. ¶¶ 3-8, 10; Pet. Ex. C: Ramirez Aff. ¶¶ 3-10; Pet. Ex. D: Rankl Aff. ¶¶ 1, 3-7.)  Since Lora's detention, his sister takes care of his two-year-old.  (Pet. ¶ 32; Lora Aff. ¶¶ 8-9; Ramirez Aff. ¶ 7; Rankl Aff. ¶¶ 14-15.)

### Lora's Criminal History

On July 10, 2009, Lora was arrested on drug related charges while at work.  (Dkt. No. 2: Pet. ¶ 34 & Ex. B: Lora Aff. ¶¶ 13-14.)  Lora posted bail and was released on July 12, 2009.  (Lora Aff. ¶ 14; Dkt. No. 6: Peleg 4/7/14 Aff. ¶ 3 & Ex. A: Bail Receipt.)

On July 21, 2010, Lora pleaded guilty and was convicted of third degree possession of a controlled substance, third degree possession of a controlled substance with intent to distribute, and third degree use of paraphernalia suitable for packing controlled substances.  (Pet. ¶ 35; Lora Aff. ¶ 14.)  Lora was sentenced to probation; he was not sentenced to any period of incarceration, was never taken into custody and never violated any terms of his probation.  (Pet. ¶¶ 35-36; Lora Aff. ¶¶ 14-15.)[1]

Lora's motion for post-conviction relief based on violations of his state and federal constitutional rights was granted on consent.  (Pet. ¶¶ 43-44; Pet. Ex. A: Peleg 3/26/14 Aff. ¶ 5; Pet.

---

[1]      Lora was sentenced to three years probation on the paraphernalia conviction and five years probation on each of the two possession convictions.  (Pet. ¶ 35; Lora Aff. ¶ 14.)

Ex. I: 3/14/14 Stip. & Waiver.)  Lora's July 2010 conviction was vacated and, on March 14, 2014,

Lora pleaded guilty and was convicted of third degree possession of a controlled substance.  (Pet.

¶ 44; Peleg 3/26/14 Aff. ¶ 5; Lora Aff. ¶ 21; Pet. Ex. I: 3/14/14 Stip. & Waiver.)[2/]  Lora was

sentenced to a conditional discharge imposed nunc pro tunc to July 21, 2010.  (Pet. ¶ 44; Peleg

3/26/14 Aff. ¶ 5; Pet. Ex. I: 3/14/14 Stip. & Waiver.)

**Lora's ICE Detention and Removal Proceedings**

          On November 22, 2013, over three years into his probation term, ICE agents took

Lora into custody on the street corner in front of his girlfriend's house.  (Dkt. No. 2: Pet. ¶¶ 37-39;

Pet. Ex. B: Lora Aff. ¶¶ 15-20; Pet. Ex. D: Rankl Aff. ¶¶ 8-11.)  ICE charged Lora with being

deportable under 8 U.S.C. § 1227(a)(2)(B)(i) for his conviction of any law relating to a controlled

substance, and preliminarily determined that he was subject to mandatory detention.  (Pet. ¶¶ 40-41;

Pet. Ex. F: Notice to Appear; Pet. Ex. G: 11/22/13 Notice of Custody Determination.)[3/]

          Lora appeared with counsel at his initial immigration court hearing on December 3,

2013, during which ICE took the position that Lora was subject to mandatory detention and was not

eligible for a bond hearing.  (Pet. ¶ 42 & Ex. A: Peleg 3/26/14 Aff. ¶ 4.)  After the initial hearing,

---

[2/]    "A person is guilty of criminal possession of a controlled substance in the third degree when he knowingly and unlawfully possesses . . . one or more preparations, compounds, mixtures or substances containing a narcotic drug and said preparations, compounds, mixtures or substances are of an aggregate weight of one-half ounce or more . . . .  Criminal possession of a controlled substance in the third degree is a class B felony."  Penal Law § 220.16(12).

[3/]    DHS originally charged Lora with being deportable on a second basis, namely, his possession with intent to distribute conviction, an aggravated felony under INA § 237(a)(2)(A)(iii).  (Pet. ¶ 40 & Ex. F: Notice to Appear at 3.)  ICE later amended Lora's deportation grounds to eliminate the aggravated felony charge as a result of the vacatur of that conviction.  (Dkt. No. 6: Peleg 4/7/14 Aff. ¶ 5.)

4

Lora's counsel successfully moved to vacate Lora's prior convictions in state court, as described above.  (See pages 2-3 above.)

Based on the vacatur of his prior convictions, Lora's counsel contends that Lora is now eligible for discretionary relief in the form of cancellation of removal under INA § 240A(a), 8 U.S.C. § 1229b(a).  (Peleg 3/26/14 Aff. ¶ 6; Peleg 4/7/14 Aff. ¶ 5.)[4/]  On March 18, 2014, Lora's counsel wrote to ICE describing the changed circumstances and requesting prosecutorial discretion, which was denied on April 4, 2014.  (Pet. ¶ 45; Peleg 3/26/14 Aff. ¶ 7; Pet. Ex. E: 3/18/14 Letter Request; Peleg 4/7/14 Aff. ¶ 7 & Ex. C: 4/4/14 ICE Letter.)

At an immigration court hearing on March 26, 2014, Lora's counsel argued that Lora was not subject to mandatory detention because he was not taken into custody "when" he was "released," as required under 8 U.S.C. § 1226(c)(1).  (Pet. ¶ 46; Peleg 3/26/14 Aff. ¶ 10.)  ICE maintained that Lora was subject to mandatory detention based on his possession conviction.  (Pet. ¶ 46; Peleg 3/26/14 Aff. ¶ 10.)  Relying on Board of Immigration Appeals ("BIA") binding precedent, Immigration Judge ("IJ") Alan Page ruled that Lora is subject to mandatory detention and ineligible for a bond hearing.  (Pet. ¶ 46; Peleg 3/26/14 Aff. ¶ 10; Peleg 4/7/14 Aff. ¶ 4 & Ex. B: IJ Page's Custody Order.)  IJ Page agreed that Lora is now eligible to apply for cancellation of removal under 8 U.S.C. § 1229b(a), but has not yet scheduled a hearing to consider the merits of Lora's application.  (Peleg 4/7/14 Aff. ¶¶ 5-6.)

To date, Lora remains in ICE custody.  (Pet. ¶ 47.)  His next immigration court status hearing is scheduled for May 15, 2014.  (Peleg 4/7/14 Aff. ¶ 6.)

---

[4/]     Under INA § 240A(a), DHS has the discretion to cancel an alien's removal if, inter alia, he "has not been convicted of any aggravated felony."  8 U.S.C. § 1229b(a)(3).

**Lora's Federal Habeas Corpus Petition**

Lora, represented by counsel, filed this federal habeas corpus petition on March 26, 2014, the same day IJ Page ruled in immigration court that Lora was subject to mandatory detention. (See Dkt. No. 2: Pet.; see also page 4 above.)  Lora seeks an order directing ICE to, inter alia, provide him with an individualized bond hearing pursuant to 8 U.S.C. § 1226(a).  (Pet. Wherefore ¶ 3.)  Lora argues that his detention is not authorized under 8 U.S.C. § 1226(c)(1), which requires an alien to be taken into ICE custody "when the alien is released" in order to be mandatorily detained.  (Pet. ¶¶ 48, 50-51.)  Specifically, Lora argues he was not detained "when" he was released since he was not taken into ICE custody until over three years after his conviction (Pet. ¶¶ 52-57), and that he could not have been detained when he was "released" since he was never imprisoned following the possession conviction that rendered him deportable (Pet. ¶¶ 58-68).  Additionally, Lora asserts that he is entitled to relief based on various constitutional violations resulting from his detention.  (Pet. ¶¶ 69-82.)

On April 7, 2014, Lora's counsel filed an Order to Show Cause and supporting brief. (Dkt. No. 5: Application for Order to Show Cause; Dkt. No. 7: Lora Br.)  On April 9, 2014, I held a telephone conference with counsel and ordered the government to submit its opposition by April 28, 2014, and Lora to submit any reply within five days of the government's filing.  (Dkt. No. 8: 4/9/14 Order.)  The government's opposition was received and has been considered.  (Dkt. No. 12: Gov't Opp. Br.)

## ANALYSIS

### I.    JURISDICTION

This Court has subject matter jurisdiction over Lora's habeas corpus petition under 28 U.S.C. § 2241(c)(3).  See, e.g., Louisaire v. Muller, 758 F. Supp. 2d 229, 234 (S.D.N.Y. 2010)

(collecting cases in which courts "exercised jurisdiction to decide similar questions of statutory interpretation under the . . . mandatory detention statute").  While the alien detention statute prohibits judicial review of the government's "discretionary judgment regarding the application of this section," 8 U.S.C. § 1226(e), "the Supreme Court has held that this provision does not deprive district courts of jurisdiction to hear petitions where, as here, the petitioner challenges the interpretation of 'the statutory framework that permits his detention without bail.'" Debel v. Dubois, 13 Civ. 6028, 2014 WL 708556 at *3 (S.D.N.Y. Feb. 25, 2014) (quoting Demore v. Kim, 538 U.S. 510, 517, 123 S. Ct. 1708, 1714 (2003)), rev'd, Dkt. No. 27: Opinion & Order (S.D.N.Y. Apr. 24, 2014).[5/]  The government does not dispute this Court's jurisdiction over Lora's petition.  (See generally Dkt. No. 12: Gov't Opp. Br.)[6/]

## II.   STANDARDS GOVERNING INTERPRETATION OF THE MANDATORY ALIEN DETENTION STATUTE

This case requires the Court to determine the meaning of "when the alien is released" as used in the provision governing mandatory detention of "criminal aliens," 8 U.S.C. § 1226(c)(1). Whether Lora is being detained in violation of the statute—and, thus, whether Lora is entitled to habeas relief—is a question of statutory interpretation.

---

[5/]   Accord, e.g., Straker v. Jones, 13 Civ. 6915, --- F. Supp. 2d ----, 2013 WL 6476889 at *3 (S.D.N.Y. Dec. 10, 2013) (citing cases); Louisaire v. Muller, 758 F. Supp. 2d at 234; Monestime v. Reilly, 704 F. Supp. 2d 453, 456 (S.D.N.Y. 2010); Garcia v. Shanahan, 615 F. Supp. 2d 175, 179 (S.D.N.Y. 2009).

[6/]   The government also does not dispute that this case was properly brought in New York since "jurisdiction over a habeas petition is established at the time the petition is filed" and Lora filed his petition while "present at the Varick Detention Center in Manhattan."  (Gov't Opp. Br. at 5 & n.6.)

**A.      The Mandatory Alien Detention Statute, 8 U.S.C. § 1226(c)**

"[F]ederal law contains two distinct provisions governing an alien's detention while removal proceedings are pending."  Straker v. Jones, 13 Civ. 6915, --- F. Supp. 2d ----, 2013 WL 6476889 at *4 (S.D.N.Y. Dec. 10, 2013); see 8 U.S.C. § 1226(a), (c).  The first provision provides for detention during removal proceedings subject to an individualized bond hearing.  8 U.S.C. § 1226(a).[7/]  Under the second provision, entitled "Detention of criminal aliens," aliens falling within certain enumerated categories "shall" be mandatorily detained without a hearing.  8 U.S.C. § 1226(c).[8/]  "The mandatory detention provision does not reflect a general policy in favor of detention; instead, it outlines specific, serious circumstances under which the ordinary procedures for release on bond at the discretion of the immigration judge should not apply."  Saysana v. Gillen, 590 F.3d 7, 17 (1st Cir. 2009); accord, e.g., Castaneda v. Souza, 952 F. Supp. 2d 307, 316 (D. Mass. 2013) ("[I]ndividualized bond hearings are the norm and mandatory detention is the exception in section 1226.").  In relevant part, the mandatory detention provision of § 1226(c) provides:

> The Attorney General[9/] shall take into custody any alien who--
>
> > (A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,

---

[7/]     See, e.g., Debel v. Dubois, 13 Civ. 6028, 2014 WL 708556 at *4 (S.D.N.Y. Feb. 25, 2014) ("Aliens not subject to mandatory detention pursuant to § 1226(c) fall under § 1226(a), which entitles them to individual bond determinations."), rev'd, Dkt. No. 27: Opinion & Order (S.D.N.Y. Apr. 24, 2014); Straker v. Jones, 2013 WL 6476889 at *4 ("Section 1226(a) allows federal immigration authorities to detain an alien during removal proceedings, subject to a bond hearing.").

[8/]     See, e.g., Straker v. Jones, 2013 WL 6476889 at *4 ("Section 1226(c), entitled 'Detention of criminal aliens,' however, provides for mandatory detention of certain criminal aliens. Immigration authorities may not provide such aliens with a bond hearing.").

[9/]     "Originally, the authority and duties imposed by § 1226(c) were those of the Attorney General; today, they belong to DHS."  Straker v. Jones, 2013 WL 6476889 at *4.

> (B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,
>
> (C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence[d] to a term of imprisonment of at least 1 year, or
>
> (D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,
>
> <u>when the alien is released</u>, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

8 U.S.C. § 1226(c)(1) (fn. & emphasis added).[10]

Congress enacted the mandatory detention provision to advance the goals of facilitating removal of those aliens who were most likely to flee, and reducing the high recidivism rate among released criminal aliens. <u>See</u> <u>Demore</u> v. <u>Kim</u>, 538 U.S. 510, 518-19, 123 S. Ct. 1708, 1715 (2003) ("Congress adopted this provision against a backdrop of wholesale failure by the INS to deal with increasing rates of criminal activity by aliens. . . . Congress also had before it evidence that one of the major causes of the INS' failure to remove deportable criminal aliens was the agency's failure to detain those aliens during their deportation proceedings.  The Attorney General at the time had broad discretion to conduct individualized bond hearings and to release criminal aliens from custody during their removal proceedings when those aliens were determined not to

---

[10]   The government has discretion to release mandatorily detained criminal aliens "only in limited circumstances, not applicable here, upon a determination that release is necessary to protect a witness in a criminal matter."  <u>Louisaire</u> v. <u>Muller</u>, 758 F. Supp. 2d 229, 235 (S.D.N.Y. 2010); <u>see</u> 8 U.S.C. § 1226(c)(2) (setting forth circumstances under which DHS "may release an alien described in paragraph (1)").

present an excessive flight risk or threat to society. . . . Once released, more than 20% of deportable

criminal aliens failed to appear for their removal hearings." (citations omitted)).[11]

### B.    Legal Standards Governing Statutory Interpretation

"'Statutory interpretation always begins with the plain language of the statute,' which

[the court] consider[s] in 'the specific context in which that language is used, and the broader context

of the statute as a whole.'" In re Ames Dep't Stores, Inc., 582 F.3d 422, 427 (2d Cir. 2009) (citations

omitted), cert. denied, 559 U.S. 962, 130 S. Ct. 1527 (2010).[12] "'To ascertain Congress's intent, we

begin with the statutory text because if its language is unambiguous, no further inquiry is

necessary.'" Clark v. Astrue, 602 F.3d 140, 147 (2d Cir. 2010).[13]

---

[11]    See also, e.g., Hosh v. Lucero, 680 F.3d 375, 381 (4th Cir. 2012); Debel v. Dubois, 2014 WL 708556 at *9 ("Congress authorized mandatory detention to 'serve[] the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed.' Additionally, Congress sought to reduce the high rates of recidivism for released criminal aliens." (citation omitted)); Louisaire v. Muller, 758 F. Supp. 2d at 235 ("Congress enacted this provision . . . in response to evidence that the INS (now ICE) was unable to remove the majority of criminal aliens, in large part because of their failure to appear for removal hearings, and that such aliens displayed a high rate of recidivism."); In re Rojas, 23 I. & N. Dec. 117, 122, 2001 WL 537957 (B.I.A. 2001) ("Congress was frustrated with the ability of aliens, and particularly criminal aliens, to avoid deportation if they were not actually in Service custody when their proceedings were completed.").

[12]    See, e.g., United States v. Robinson, 702 F.3d 22, 31 (2d Cir. 2012) ("'The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'"), cert. denied, 133 S. Ct. 1481 (2013); In re N.Y. Times Co., 577 F.3d 401, 406 (2d Cir. 2009) (in construing statutes, a court should "examine the text of the statute itself, interpreting provisions in light of their ordinary meaning and their contextual setting").

[13]    See also, e.g., In re Barnet, 737 F.3d 238, 246 (2d Cir. 2013) ("Where the statute's language is plain, the sole function of the courts is to enforce it according to its terms." (quotations omitted)); Hedges v. Obama, 724 F.3d 170, 189 (2d Cir. 2013) ("'When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.'"), petition for cert. filed, 82 U.S.L.W. 3385 (Dec. 16, 2013); Dobrova v. Holder, 607 F.3d 297,

(continued...)

"At the same time, we must interpret [a] specific provision in a way that renders it consistent with the tenor and structure of the whole act or statutory scheme of which it is a part.  We give effect, if possible, to every clause and word of a statute."  Bechtel v. Competitive Techs., Inc., 448 F.3d 469, 471 (2d Cir. 2006) (quotations & citations omitted); accord, e.g., In re Barnet, 737 F.3d at 250 ("A properly limited contextual analysis of statutory language is encompassed within the ambit of a textual analysis."); United States v. Vargas-Cordon, 733 F.3d 366, 381 (2d Cir. 2013) ("'[P]lain meaning can best be understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute.'").[14]

When faced with an administrative agency's interpretation of a statute, the Supreme Court has provided a two-step process for reviewing the agency's construction of the statute.  See,

---

[13]    (...continued)
301 (2d Cir. 2010) ("[S]tatutory analysis necessarily begins with the plain meaning of a law's text, and, absent ambiguity, will generally end there." (quotations omitted)); United States v. Hasan, 586 F.3d 161, 167 (2d Cir. 2009) ("'Where the statute's language is plain, the sole function of the courts is to enforce it according to its terms.'"), cert. denied, 131 S. Ct. 317 (2010); Life Receivables Trust v. Syndicate 102 at Lloyd's of London, 549 F.3d 210, 216 (2d Cir. 2008) ("'When a statute's language is clear, our only role is to enforce that language "according to its terms."'").

[14]    See, e.g., In re Bernard L. Madoff Inv. Sec. LLC, 654 F.3d 229, 237 (2d Cir. 2011), cert. denied, 133 S. Ct. 24, 25 (2012); United States v. Gayle, 342 F.3d 89, 92-93 (2d Cir. 2003) ("Statutory construction begins with the plain text and, if that text is unambiguous, it usually ends there as well.  Most of the courts that have found 'in any court' to include foreign courts have stressed the unambiguously expansive nature of the phrase. . . . Our textual analysis of what constitutes a predicate offense under § 922(g)(1), however, does not end with the words 'in any court.'  'The text's plain meaning can best be understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute.'" (citations omitted)), cert. denied, 544 U.S. 1026, 125 S. Ct. 1968 (2005); Auburn Housing Auth. v. Martinez, 277 F.3d 138, 144 (2d Cir. 2002) ("'Statutory construction . . . is a holistic endeavor.'  The meaning of a particular section in a statute can be understood in context with and by reference to the whole statutory scheme, by appreciating how sections relate to one another.  In other words, the preferred meaning of a statutory provision is one that is consonant with the rest of the statute." (citations omitted)).

e.g., Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-44, 104 S. Ct. 2778, 2781-82 (1984).  The first step is to determine whether congressional intent is clear.  Id. at 842, 104 S. Ct. at 2781.  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  Id. at 842-43, 104 S. Ct. at 2781.  If congressional intent is ambiguous, the second step is to determine if the agency's statutory construction is "arbitrary, capricious, or manifestly contrary to the statute."  Id. at 844, 104 S. Ct. at 2782.  While the Court must defer to an agency's reasonable interpretation of an ambiguous statute, it "must reject administrative constructions which are contrary to clear congressional intent."  Id. at 843 n.9, 104 S. Ct. at 2781 n.9.

## III.    LORA'S MANDATORY DETENTION IS NOT AUTHORIZED BY § 1226(c)

The meaning of the mandatory detention statute's "when the alien is released" clause has been the subject of recent debate among federal courts.[15/]  This case raises two issues regarding the meaning of the clause: (1) whether the word "when" imposes a temporal limit on DHS's power to mandatorily detain criminal aliens; and (2) whether the word "released" includes a pre-conviction release from arrest or post-conviction release from non-physical custody, i.e., court supervision. Neither the Supreme Court nor Second Circuit have opined on the precise questions presented here,

---

[15/]    See, e.g., Debel v. Dubois, 13 Civ. 6028, 2014 WL 708556 at *4 (S.D.N.Y. Feb. 25, 2014) (§ 1226(c) "has recently become the subject of much debate among the federal courts"), rev'd, Dkt. No. 27: Opinion & Order (S.D.N.Y. Apr. 24, 2014); Straker v. Jones, 13 Civ. 6915, --- F. Supp. 2d ----, 2013 WL 6476889 at *4 (S.D.N.Y. Dec. 10, 2013) (noting that "issues about the meaning of this clause" have "been the subject of extensive litigation in the federal courts").

and the circuit and district courts (both inside and outside the Second Circuit) that have addressed these issues are not in agreement.[16]

### A.    Interpretation of "When" and Application to Lora's Detention

Lora argues that the word "when" in the "when the alien is released" clause requires DHS to detain the alien at or around the time of his release from criminal custody in order to fall within the ambit of the mandatory detention provision, i.e., the statutory authority created by this provision is limited; only aliens who are picked up when they are released may be mandatorily detained; thereafter, detention must occur under Section 1226(a), entitling the alien to an individualized bond hearing.  (Dkt. No. 7: Lora Br. at 8-18.)  The government argues that the clause identifies the moment at which DHS's duty to detain arises, but does not limit the duty's exercise to that specific moment in time.  (Dkt. No. 12: Gov't Opp. Br. at 11-18.)

The courts that have addressed the meaning of the word "when" as used in this clause generally have adopted one of the interpretations advanced by the parties: (1) "the 'time-limiting' construction," under which courts interpret it "to mean that DHS can subject an alien to mandatory detention only if it detains him at, or around, the time he is released from criminal custody for the removable offense"; and (2) "the 'duty-triggering' construction," under which courts interpret it "as creating a pre-condition for DHS to exercise its mandatory detention authority, but not as setting a deadline for its use."  Straker v. Jones, 13 Civ. 6915, --- F. Supp. 2d ----, 2013 WL 6476889 at *5-6 (S.D.N.Y. Dec. 10, 2013) (labeling competing constructions and collecting cases).

The Board of Immigration Appeals ("BIA") appears to have adopted the duty-triggering construction in a 2001 decision in which it held that a criminal alien detained on "the

---

[16]    See, e.g., Debel v. Dubois, 2014 WL 708556 at *4 ("The Second Circuit has not yet opined on the issue and courts are divided as to its meaning."); see also pages 12-23 below.

second day of his release on criminal parole" was "subject to mandatory detention pursuant to section 236(c) of the Act, despite the fact that he was not taken into Service custody immediately upon his release from state custody."  In re Rojas, 23 I. & N. Dec. 117, 118, 127, 2001 WL 537957 (B.I.A. 2001)[17/]; see Sylvain v. Attorney Gen., 714 F.3d 150, 156 (3d Cir. 2013) ("Over a decade ago, the Board of Immigration Appeals concluded that mandatory detention does not require immediate detention.").  Most courts that have adopted the duty-triggering construction have found the "when . . . released" clause ambiguous, and held that the BIA's Rojas decision is a reasonable interpretation entitled to Chevron deference.  See, e.g., Hosh v. Lucero, 680 F.3d 375, 379-80 & n.2 (4th Cir. 2012) (collecting cases); Straker v. Jones, 2013 WL 6476889 at *6-9 (collecting cases); see also, e.g., Sylvain v. Attorney Gen., 714 F.3d at 156 & n.5 (collecting cases).[18/]

The majority of district courts to address the issue, however, have adopted the time-limiting construction, rejecting the BIA's interpretation and holding "that the statute unambiguously provides that ICE may only subject an alien to mandatory detention if it detains him immediately

---

[17/]    It is important to note that "[a]lthough not explicitly identified as [a] consideration[], the BIA's [Rojas] decision appears to be motivated by the fact[] that Rojas had only been at liberty for two days." Debel v. Dubois, 13 Civ. 6028, 2014 WL 708556 at *8 (S.D.N.Y. Feb. 25, 2014) ("Indeed, what is missing from Rojas is any consideration whatsoever as to whether Congress intended some outer temporal boundary that would curtail ICE's authority under § 1226(c) in order to ensure the statute did not run afoul of due process."), rev'd, Dkt. No. 27: Opinion & Order (S.D.N.Y. Apr. 24, 2014).  "It does not follow from" Rojas' allowance of a two-day gap "that a four-year delay would be similarly permissible." Debel v. Dubois, 2014 WL 708556 at *9.

[18/]    The Third Circuit's rejection of the time-limiting construction was not based on Chevron deference to Rojas, but rather its finding that "nothing in the statute suggests that immigration officials lose authority if they delay," Sylvain v. Attorney Gen., 714 F.3d at 157, i.e., that "even if we assume that the statute commands federal authorities to detain criminal aliens at their exact moment of release from other custody, we still conclude that a criminal alien who is detained after that exact moment is not exempt from mandatory detention." Hosh v. Lucero, 680 F.3d at 381-83 (explaining this reasoning as an alternative basis for its adoption of duty-triggering construction in deference to Rojas).

at or around the time he is released from criminal custody for the underlying offense." Debel v. Dubois, 2014 WL 708556 at *4 (collecting cases); accord, e.g., Valdez v. Terry, 874 F. Supp. 2d 1262, 1274-75 (D.N.M. 2012) ("[M]ost federal district courts that have ruled on this issue have agreed that 'when the alien is released' unambiguously means immediately after release from custody and have rejected the BIA's interpretation of § 1226(c).  The Court finds the reasoning of these decisions to be persuasive." (citations omitted & collecting cases)); Louisaire v. Muller, 758 F. Supp. 2d 229, 236 (S.D.N.Y. 2010) ("Rojas . . . is wrong as a matter of law and contrary to the plain language of the statute.  The clear purpose of § 1226(c)(1) is to authorize the mandatory detention of immigrants who have committed offenses enumerated within § 1226(c)(1)(A)-(D) immediately upon their release from criminal sentences for those same offenses, even if they are still serving part of their sentence out in the community . . . .  A majority of courts that have examined this issue have held that the mandatory statute is unambiguous on this point." (collecting cases)); Garcia v. Shanahan, 615 F. Supp. 2d 175, 180-82 & n.2 (S.D.N.Y. 2009) ("For over a decade, courts analyzing Section 1226(c) have consistently interpreted the statute to authorize the government to take an alien into custody on or about the time he is released from custody for the offense that renders him removable. . . . The Court finds that the plain language of the statute is unambiguous and manifests Congress' clear intent that there must be a nexus between the date of release and the removable offense." (collecting cases)).[19]

---

[19]    See, e.g., Monestime v. Reilly, 704 F. Supp. 2d 453, 458 (S.D.N.Y. 2010); Scarlett v. U.S. Dep't of Homeland Sec., 632 F. Supp. 2d 214, 219-20 (W.D.N.Y. 2009) (discussing "persuasive" cases holding "the statute does not apply when the alien was not taken into immigration custody at the time of his release from incarceration on the underlying criminal charges"); Bromfield v. Clark, No. C06-757, 2007 WL 527511 at *4 (W.D. Wash. Feb. 14, 2007); Quezada-Bucio v. Ridge, 317 F. Supp. 2d 1221, 1229-30 (W.D. Wash. 2004); Pastor-Camarena v. Smith, 977 F. Supp. 1415, 1417-18 (W.D. Wash. 1997) ("The plain meaning (continued...)

The Court is persuaded by the analyses of these district courts and agrees that "the clear language of the statute indicates that the mandatory detention of aliens 'when' they are released requires that they be detained at [or near] the time of release." Alikhani v. Fasano, 70 F. Supp. 2d 1124, 1130 (S.D. Cal. 1999).

As several courts have explained, "'[t]he term "when" includes the characteristic of "immediacy," referring in its primary conjunctive sense, to action or activity occurring "at the time that" or "as soon as" other action has ceased or begun.'" Scarlett v. U.S. Dep't of Homeland Sec., 632 F. Supp. 2d at 219; accord, e.g., Castaneda v. Souza, 952 F. Supp. 2d 307, 313 (D. Mass. 2013) ("'When' typically means 'at the time.' Thus, this Court holds that the most natural reading of 'when . . . released' is 'at the time of release' or 'immediately upon release.'"); Alikhani v. Fasano, 70 F. Supp. 2d at 1130 ("Webster's Third New International Dictionary defines 'when' as 'just after the moment that.'").  It therefore would pervert the statute's plain meaning to interpret the command to mandatorily detain "'certain criminal aliens "when" those aliens are released from state custody to include those aliens who had "already" been released from state custody.'" Scarlett v. U.S. Dep't of Homeland Sec., 632 F. Supp. 2d at 219; accord, e.g., Oscar v. Gillen, 595 F. Supp. 2d 166, 169 (D. Mass. 2009) ("While § 1226(c) authorizes detention 'when the alien is released,' Respondent apparently read this provision to mean 'any time after the alien is released.'  But this interpretation perverts the plain language of the statute.").

---

[19]/   (...continued)
of this language is that it applies immediately after release from incarceration, not to aliens released many year[s] earlier.  In this context, it was arbitrary and capricious for respondents to interpret the language . . . to include aliens . . . who were released from incarceration many years before coming into the custody of the INS for deportation proceedings." (citations omitted)); see also, e.g., Sylvain v. Attorney Gen., 714 F.3d at 156 n.6 (collecting cases rejecting argument that statute is ambiguous and requires deference); Straker v. Jones, 2013 WL 6476889 at *5 (collecting cases adopting time-limiting construction).

"Thus, if Congress had intended for mandatory detention to apply to aliens at any time after they were released, it easily could have used the language 'after the alien is released,' 'regardless of when the alien is released,' or other words to that effect.  Instead, Congress chose the word 'when,' which connotes a much different meaning."  Quezada-Bucio v. Ridge, 317 F. Supp. 2d at 1230; accord, e.g., Castaneda v. Souza, 952 F. Supp. 2d at 314 ("This Court rejects [the government's] contention because the word 'after' rather than 'when' would communicate such a meaning much more clearly. . . . The context within which 'when' is situated strongly suggests that it is intended as a timing element that means at 'a specific time,' rather than 'after' . . . ."); Bromfield v. Clark, 2007 WL 527511 at *4; Alikhani v. Fasano, 70 F. Supp. 2d at 1130.  Indeed, the statute's language has evolved from prior versions, suggesting that the current word choice is a precise reflection of Congress's intent.  See, e.g., Saysana v. Gillen, 590 F.3d 7, 15 (1st Cir. 2009) ("[O]ne prior version of the mandatory detention provision required the Attorney General to take the alien into custody 'upon completion of the alien's sentence for such conviction.'"); In re Rojas, 23 I. & N. Dec. at 124 ("In sum, the statute has contained different phrases over the years, from 'upon completion of the alien's sentence' to 'upon release of the alien' to 'when the alien is released.'").

The government's interpretation of the "when . . . released" phrase would render it "surplusage."  Valdez v. Terry, 874 F. Supp. 2d at 1265 ("[I]f the term 'when the alien is released' means that the Attorney General shall take into custody any aliens who have committed offenses enumerated within § 1226(c)(1)(A)-(D) without regard to the timing of that alien's release from custody, then the phrase 'when the alien is released' becomes meaningless surplusage.").

The structure of § 1226(c) further "suggest[s] to this Court that Congress intended the 'when . . . released' language to mean immediately upon release."  Castaneda v. Souza, 952 F. Supp. 2d at 314.  As the Castaneda court stated:

> First, the statute begins, not with provisions for mandatory detention, but rather with those for arrest and detention subject to an individualized bond hearing and potential release. . . . Section 1226(c), the exception for certain aliens, identifies those aliens in 1226(c)(1). Congress requires the Attorney General to take these specific criminal aliens into custody "when the alien is released."

> Congress's structuring of section 1226 in this way is no accident. Congress intended that aliens taken into custody typically receive a bond hearing; it then provided an exception in certain cases—certain criminal aliens who have been picked up by ICE immediately upon release from their custodial sentence should not be bonded out or paroled into our communities no matter the circumstances. The mandatory detention provision is, thus, a limited exception.

Castaneda v. Souza, 952 F. Supp. 2d at 314-15 (citation omitted).

This interpretation is consistent with the purposes underlying the enactment of the mandatory detention provision, i.e., facilitating removals and reducing recidivism. (See pages 8-9 & n.11 above.) As prior decisions have explained:

> This Court can find no support for the idea that Congress intended to subject criminal aliens already released to mandatory detention. After all, Congress chose not to make the provisions retroactive and require mandatory detention of those criminal aliens who had completed their custodial sentence before the effective date of the provision. These criminal aliens, already in the community, could be detained by ICE, but would receive individualized detention hearings.

> . . . .

> [Petitioner] has already returned to her community. The congressional "purpose of preventing the return to the community of those released in connection with the enumerated offenses," does not apply to [petitioner] as she has lived in the community for three years. Given that mandatory detention would not satisfy the congressional purpose of this provision, . . . this Court is at a loss as to what other purpose mandatory detention could serve. This Court simply sees no reason why Congress would have intended for her to be picked up years after she has reintegrated back into her community and to be held without presentment before an immigration judge for a bond determination.

Castaneda v. Souza, 952 F. Supp. 2d at 317 (citations & fn. omitted).[20]

---

[20]   See also, e.g., Saysana v. Gillen, 590 F.3d at 17-18 ("[I]t is counter-intuitive to say that
(continued...)

Finally, and perhaps most importantly, interpreting § 1226(c) to require immediate detention does not extinguish ICE's detention authority where there is a delay, it merely restores the alien's right to an individualized bond hearing:

> [R]eading the "when . . . released" language to mean immediately upon release or within a reasonable period of time does not mean [petitioner] goes free. Instead, she is entitled merely to a bond hearing. Her likelihood of complying with a deportation order is a factor in whether she is to be granted bond and released by an immigration hearing officer. . . . [F]ailure to take an alien into custody at the moment of release or within a reasonable period of time does not result in a loss of power or authority. The Attorney General must grant the alien an individualized bond hearing, but can still deny bond and hold the alien. No power or authority has been lost.

Castaneda v. Souza, 952 F. Supp. 2d at 317 n.8, 319; see also, e.g., Valdez v. Terry, 874 F. Supp. 2d at 1276; Quezada-Bucio v. Ridge, 317 F. Supp. 2d at 1231.[21]

Applying the statute as construed above to Lora's case, it is clear that his mandatory detention is not authorized by § 1226(c) because he was not taken into custody until November 22, 2013—more than four years after his July 2009 arrest and release on bail, and more than three years after his July 2010 conviction and sentencing. (See pages 2-3 above.)[22] Lora has been a lawful

---

[20] (...continued)
aliens with potentially longstanding community ties are, as a class, poor bail risks. . . . By any logic, it stands to reason that the more remote in time a conviction becomes and the more time after a conviction an individual spends in a community, the lower his bail risk is likely to be.").

[21] Because ICE does not lose its ability to detain altogether when it delays in taking custody of a deportable alien, the Court disagrees with the Third Circuit's contrary interpretation, which was based on its refusal to find "that immigration officials lose authority if they delay" (see page 13 n.18 above). See, e.g., Castaneda v. Souza, 952 F. Supp. 2d at 318-20.

[22] While Lora withdrew and reentered his plea and was re-sentenced in March 2014, the plea and sentence were imposed nunc pro tunc to July 2010. (See page 3 above.) In any event, even if the March 2014 date were considered a release date for purposes of this analysis, it would not remedy ICE's noncompliance with § 1226(c), since Lora was not detained "when" his nunc pro tunc sentence was imposed in March 2014, but rather was detained several
(continued...)

permanent resident of the United States since 1990, has strong family ties in New York, and has remained law-abiding since the time of his 2009 arrest.  (See page 2 above.)  "While the exact point at which ICE loses its authority to detain without affording an alien an individualized bail hearing under § 1226(c) may be unclear, the Court is confident that a [three- or] four-year gap between criminal release and assumption of immigration custody is an unreasonable delay for an alien such as" Lora.  Debel v. Dubois, 2014 WL 708556 at *10 (Petitioner "has lived in the United States since 1990, has a wife and two children, and has remained law-abiding since the time of his release more than four years ago.  As a result, he should not be subject to mandatory detention under § 1226(c) and instead should be entitled to a hearing to determine whether, in these circumstances, he poses a risk of danger or flight." (citation omitted)); e.g., Scarlett v. U.S. Dep't of Homeland Sec., 632 F. Supp. 2d at 219-20 ("[P]etitioner's detention was not authorized by 8 U.S.C. § 1226(c) because petitioner was released from incarceration nearly eighteen months prior to his immigration detention.  Instead, petitioner's detention was authorized by 8 U.S.C. § 1226(a), which affords petitioner the opportunity for an individualized bond hearing before an immigration judge.").[23]

---

[22]     (...continued)
months before in November 2013.  (See page 3 above.)

[23]     See, e.g., Castaneda v. Souza, 952 F. Supp. 2d at 321 ("This Court rules that section 1226(c) applies only to those criminal aliens detained immediately upon release from criminal custody or within a reasonable period of time thereafter.  While it has no occasion in this case to determine what constitutes a reasonable period of time, this Court would suggest that any alien who has reintegrated back into his community has not been detained within such a reasonable period of time.  [Petitioner], having lived in her community for three years after even her probationary period was complete, must certainly receive an individualized bond hearing."); Monestime v. Reilly, 704 F. Supp. 2d at 458 ("[G]iven that eight years have passed since [petitioner] was convicted of his second misdemeanor, there appear to be no public safety factors justifying his prolonged detention.  After all, the reasons that justify § 1226(c) detention are 'based upon the Government's concerns over the risks of flight and danger to the community . . . and the ultimate purpose behind the detention is premised upon
(continued...)

**B.**     **Interpretation of "Released" and Application to Lora's Detention**

Even if the Court were to accept the government's interpretation of the word "when" as triggering a duty that never expires, Lora argues that he nevertheless would not be subject to mandatory detention since he "was never 'released' from a post-conviction sentence of incarceration, because he was never sentenced to any time in jail." (Dkt. No. 7: Lora Br. at 20.)  Lora argues that the word "released" in the "when the alien is released" clause, means "a release from a post-conviction sentence of incarceration for an enumerated offense, regardless of whether a non-custodial portion of the sentence has yet to be served." (Lora Br. at 19.)  In opposition, the government argues that the word "released" as used in § 1226(c) has a broader meaning, namely that Lora's pre-conviction release from arrest in July 2009 and his post-conviction release from his bail conditions into probation in July 2010 constitute qualifying releases for purposes of the mandatory detention statute.  (See Dkt. No. 12: Gov't Opp. Br. at 18-22.)

Though the meaning of the word "when" has been litigated extensively in federal courts (see pages 11-14 above), the meaning of the word "released" has received less attention.  See Straker v. Jones, 13 Civ. 6915, --- F. Supp. 2d ----, 2013 WL 6476889 at *4 (S.D.N.Y. Dec. 10, 2013) ("[P]etition[er] raises two issues about the meaning of this clause: what the word 'when' means, and what the word 'released' means.  The first issue has been the subject of extensive litigation in the federal courts; the second, less so.").  While the few courts that have considered

---

23/     (...continued)
the alien's deportability.'  DHS can only determine whether [petitioner] poses a risk of flight or danger to the community through an individualized bond hearing.  Such a hearing is particularly important when, as here, an alien is being deported for an offense committed many years prior to his detention and removal charges." (citations omitted)); see also cases cited on page 14 & n.19 above.

what constitutes a qualifying release are not in agreement, this Court is persuaded by Judge Engelmayer's recent analysis of this question in <u>Straker</u> v. <u>Jones</u>, 2013 WL 6476889 at *9-15.

As to the government's first contention, although the BIA has twice held that the word "released" includes pre-conviction releases from arrests, <u>see</u> <u>In re Kotliar</u>, 24 I. & N. Dec. 124, 125, 2007 WL 858345 (B.I.A. 2007); <u>In re West</u>, 22 I. & N. Dec. 1405, 1410, 2000 WL 1612317 (B.I.A. 2000), the decisions provide "little reasoning in support of its conclusion on this point." <u>Straker</u> v. <u>Jones</u>, 2013 WL 6476889 at *12.[24/]  Judge Engelmayer, on the other hand, conducted a thorough and well-reasoned statutory analysis, and concluded that a pre-conviction release from arrest cannot constitute a qualifying release under § 1226(c).  <u>See</u> <u>Straker</u> v. <u>Jones</u>, 2013 WL 6476889 at *10-13. As Judge Engelmayer explained, the BIA's interpretation cannot be squared with the statute's plain language:

> DHS argues that an alien's release after an arrest made as part of the process that later leads to a qualifying conviction under § 1226(c)(1)(B) is a "release" within the meaning of the statute.  But the statute's plain language makes that construction unsustainable.  In mandatory terms, the statute requires that DHS "shall take into custody any alien who . . . is deportable by reason of having committed any [covered] offense . . . <u>when the alien is released</u>."  And the four categories of aliens listed in § 1226(c)(1)(B) all refer to aliens who have been convicted of covered offenses.
>
> The statute's text thus naturally fits the paradigm in which the alien (1) is convicted of an offense enumerated in § 1226(c)(1)(B), (2) serves a prison sentence for such a conviction, and thereafter (3) is released to DHS.  But, by definition, an alien who is (1) arrested, (2) released, and only later (3) convicted of and sentenced for a covered offense, is not and cannot be eligible to be taken into DHS custody

---

[24/]   The Third Circuit has agreed with the BIA's interpretation, also without analysis.  <u>See</u> <u>Desrosiers</u> v. <u>Hendricks</u>, 532 F. App'x 283, 285-86 (3d Cir. 2013); <u>Gonzalez-Ramirez</u> v. <u>Sec'y of U.S. Dep't of Homeland Sec.</u>, 529 F. App'x 177, 180-81 (3d Cir. 2013), <u>cert. denied</u>, 134 S. Ct. 956 (2014); <u>Sylvain</u> v. <u>Attorney Gen.</u>, 714 F.3d 150, 161 (3d Cir. 2013); <u>see also</u> <u>Straker</u> v. <u>Jones</u>, 2013 WL 6476889 at *12 n.9 ("The Third Circuit has three times followed <u>West</u> and <u>Kotliar</u>, but without substantive analysis of the proposition that a pre-conviction release following an arrest is a 'release' under § 1226(c).").

pursuant to the mandatory detention statute at the moment of his release.  That is because, at that point, the alien's guilt or innocence as to the qualifying offense remains sub judice.  The same analysis holds under § 1226(c)(1)(C).  An alien who is arrested and released prior to his conviction cannot come within that provision, which provides for mandatory detention upon release "on the basis of an offense for which the alien has been sentenced to a term of imprisonment of at least 1 year," because, at that point, no sentence has been imposed.

DHS's thesis that pre-conviction release satisfies the statute thus cannot be squared with the statute's command that detention becomes mandatory "when the alien is released."  For such an alien, the word "released" cannot mean a "release" from pre-conviction arrest.

Straker v. Jones, 2013 WL 6476889 at *10-11 (citations & fn. omitted); accord, e.g., Valdez v. Terry, 874 F. Supp. 2d 1262, 1273 (D.N.M. 2012) ("Petitioner contends that his detention prior to his convictions does not satisfy the 'when released' requirement of § 1226(c) because that provision is not triggered until there is a conviction.  The Court agrees that § 1226(c) did not apply to Petitioner until his second conviction because § 1226(c) applies to Petitioner by virtue of § 1227(a)(2)(A)(ii), which requires that an alien be 'convicted of two or more crimes involving moral turpitude.'").  The Court is persuaded by this analysis and agrees that an alien's pre-conviction release from arrest does not constitute a qualifying release under § 1226(c).

As to the government's second contention, the BIA has held that a qualifying release under § 1226(c)(1) is a release from physical custody, not merely the termination of some type of court supervision, such as the release from bail conditions.  See In re West, 22 I. & N. Dec. at 1409-10 ("Congress is referring to the release of an alien from a restrictive form of criminal custody involving physical restraint to a less restrictive form of criminal custody without physical restraint.").  The Court again is persuaded by Judge Engelmayer's analysis, finding the statute ambiguous on this issue, and deferring to the BIA's reasonable interpretation:

Here, the BIA has determined that "released" in § 1226(c)(1) "refer[s] to the release of an alien from a restrictive form of criminal custody involving physical

restraint."  The BIA noted that the "'when released' language of [§ 1226(c)] . . . is modified by the subsequent clause[]: 'without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.'"  It reasoned: "The natural reading of the words 'released on' within the context of these clauses of [§ 1226(c)(1)] suggests that Congress is referring to the release of an alien from a restrictive form of criminal custody involving physical restraint to a less restrictive form of criminal custody without physical restraint."  The BIA stated that its reading of "released" to connote termination of a physical restraint was further supported by "[t]he reference in the last clause of the sentence to the possibility that the alien may be returned to a criminal custody status involving physical restraint."

Further supporting this construction, the BIA noted that, throughout § 1226, "the use of the words 'release' or 'released' . . . consistently appears to refer to a form of physical restraint."  In addition to its usage in § 1226(c), the BIA examined the "[t]he use of the term 'release' in the provisions relating to the release of an alien on an immigration bond," including § 1226(a).  In these contexts, too, the BIA concluded, "release" "obviously refers to release of the alien from the physical custody of the Service."

. . . .

The Court, accordingly, holds, in deference to the BIA's reasonable interpretation in West, that an alien's release from non-physical restraints such as court supervision, probation, parole, or supervised release does not qualify as a release that triggers DHS's duty to detain an alien under any part of § 1226(c).  Under the statute, an alien's release to probation or supervised release, from a period of imprisonment, assuredly counts as a "release" within the meaning of the statute.  However, the cessation of such forms of supervision, where there has been no antecedent term of imprisonment from which the alien has been released, does not qualify as a "release."

Straker v. Jones, 2013 WL 6476889 at *13-15 (citations & fn. omitted).  The Court agrees and concludes that when an alien is released into probation, not from a period of imprisonment but from another form of court supervision or non-physical custody, the alien has not been "released" within the meaning of § 1226(c).

Based on the foregoing interpretation, Lora was never "released" within the meaning of § 1226(c).  First, his 2009 pre-conviction release from his arrest did not constitute a qualifying release since Lora had not yet been convicted of the offense which later rendered him deportable.

(See pages 2, 21-22 above.)[25/]  Second, Lora's post-conviction release from his bail conditions into probation likewise did not constitute a qualifying release under § 1226(c)(1) since Lora was not released into probation from a period of imprisonment, but rather was released from one form of non-physical court supervision to another.  (See pages 2, 22-23 above.)  Thus, even if the word "when" did not impose a temporal limit, Lora's mandatory detention still would not be authorized because there has been no qualifying "release" under § 1226(c).

## CONCLUSION

For the reasons set forth above, Lora's habeas corpus petition (Dkt. No. 2) is GRANTED.  The government is directed to provide Lora with an individualized bond hearing by May 15, 2014 (when he already is scheduled for a conference before an Immigration Judge).

SO ORDERED.

Dated:     New York, New York
           April 29, 2014

_____
**Andrew J. Peck**
United States Magistrate Judge

Copies ECF to: All Counsel

---

[25/]     Lora is charged with being deportable under 8 U.S.C. § 1227(a)(2)(B)(i) because he was convicted of a violation relating to a controlled substance.  (See page 3 above.)  Thus, Lora only became deportable under subsection (B) of the mandatory detention statute when he was convicted.  See 8 U.S.C. § 1226(c)(1)(B) (ICE "shall take into custody any alien who . . . is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title, . . . when the alien is released . . . ."); 8 U.S.C. § 1227(a)(2)(B)(i) ("Any alien who at any time after admission has been convicted of a violation of . . . any law or regulation of a State, the United States, or a foreign country relating to a controlled substance . . . is deportable." (emphasis added)).